Good afternoon. May it please the court, my name is Kimona Hogan. I'm here for the appellant Shira Herbert in the minor child DH. To the extent that I do not address certain issues today, those issues are preserved in our briefs and this case includes some IDEA section 504 and ADA claims, but I will focus on the questions. The court issue is an IDEA question which asks, after enrolling a student, evaluating him, and finding him eligible for special education, can a school district avoid the IDEA obligations by later claiming that the student is not a resident? The answer is no. Once the school district determined eligibility under section 1414 of the IDEA, my client became a child with a disability. So are you saying residence is waivable? If residence was a requirement, are you saying once the child was admitted, they'd be the way forfeited or the requirement is no longer there? No sir, what I'm saying is once the school district evaluated the student, certain protections attached, and now the any residency claims would have to be evaluated under the IDEA framework. So residency is not waived, that is an issue or duty that was like in our court. To get in here, the first thing we do is, do we have jurisdiction? Yes. And jurisdiction cannot be waived, there's no jurisdiction no matter how titillating the issue, how much we want to grab it, if there's no jurisdiction, out the door. Either diversity statute or whatever. It's just sometimes may not be even noted until later, but if there's no jurisdiction, it just doesn't wipe clean, you know, everything else. I'm not trying to say necessarily that residence is like jurisdiction, but it's a threshold piece, at least the way I read it, and so where do we read in the IDEA that encompasses, you know, the argument that you would just make? It's a sequence, so the sequence starts with the eligibility determination under section 1414 of the IDEA. At that point, the child is determined to be a child with a disability under section 1401, and then at that point, the statute requires the school district to proceed under the procedural safeguards, which can be found under section 1415, and at that point, the procedural safeguards attached in any disputes have to be resolved under the IDEA framework. But doesn't that presuppose that the student is a member of the school district in particular? Maybe I'm re-asking the same question that Judge Stewart asked, but it seems like it's a threshold inquiry that a student is eligible for such an evaluation because the student is a member of that school district. So the school districts do have a duty to flesh out whether students are residents or not. In this case, there was an application process. The school district had a policy for people who are not residents of that parish to be able to attend school within the parish, and so based upon the school district's review of the application, the acceptance of the application, once they evaluated the child and then determined that he was eligible for special education, that triggered the IDEA protections. And the application process depends on the candor of the applicant, isn't that correct? That the school board and school district people are in charge of making these decisions, receive accurate information about things, about several things, one of which, importantly, is residency in the school district. Would you agree with that? In this particular process for this school district, for people who are not residents, just by way of applying through this particular mechanism, it's already assumed that they're not a resident. Hence the reason that they're applying through this particular mechanism to attend school within that particular district. What is the policy for non-resident students? The policy for non-resident students is that they had to reside with a person who is a resident of the district. Their policy required that IDs and like a utility bill had to be submitted along with a notarized letter saying that the student is a resident of that parish by way of living with a resident. So are you saying that, putting aside the other that, your client should have been encompassed within that policy as well? I'm saying that my client did do an application. The school district reviewed that application under its own policy and accepted the enrollment based on the information that was provided. On that application, the parent did list that her out-of-parish address several times. So again, it is the duty of the school district to review those applications. But it didn't expressly claim the benefit of services based on non-resident policies. It just listed two parishes. There was one form that has two parishes listed. And again, if there are any concerns about whether a person is a resident of that parish or not, it is the duty of the school district to clear up those inconsistencies and clarify before they actually enroll. And again, what we're saying is that it's not necessarily the enrollment that triggered the protections. It was at the point that the school district evaluated the student and determined that he was eligible for the special education services. Now the school district just had to go through certain procedures. What can happen in situations is that residency under the state St. Tammany v. Louisiana case is now turned to an allocation issue. So what we're looking at who is responsible for providing and paying for services, not using residency to circumvent the IDEA process. What could have happened is services could be provided and if it's later determined that this student is not a resident of the parish, then they could just request reimbursement from the proper party. However, in this case your client, correct me if I'm wrong, but your client attested in a sworn affidavit that she and DH, quote, are living and physically residing, close quote, in St. James Parish and that she does, quote, not reside at any other home or residency. That's a quote from the affidavit. Sounds like your argument is if the school board doesn't catch a false statement, then they waive. They have to be given proper information before they can say, well, this student resides outside of the parish. However, we have engaged in a process that allows us to take the student, which is different than being told a falsehood. Yes, sir, I understand. Again, on this application, again, no less than five times there was an out-of-district address that was listed. There was an attestation that was notarized in small lettering, so that could have been an oversight. However, that still doesn't negate that at the point that this school district evaluated the student and determined he was eligible, there were just certain procedural safeguards that required this district to go through to provide, for instance, notice of their decision. It required that the parent now has a right to go to due process and as a part of that... It sounds like you're arguing that once you get, once the student gets the evaluation, residency is just not relevant. Is that a fair... I'm not saying that. What I am saying is that once the student is evaluated and determined to be, and determined to be eligible for special education, there's certain safeguards that attach, and if it is determined later that the student is not a resident, then there's a mechanism for the district to request, say, a reimbursement. However, the federal protections under 1415 guarantee a student stay put protections, which are going to ensure the continuity of his education while they are going through the process of resolving their residency issue. So again, had this been fleshed out prior to the student being determined to be eligible, then he's just not a resident. It falls under the school district's policies, but at the moment that the stay put protections applied, they just had to go through the process, again, which looks like providing notice, which looks like given the opportunity for due process and stay put is also right under section 1415. So if they had caught this at the very beginning, there would be no issue? I'm not saying that. I'm just saying that if they caught it prior to the student being determined eligible for special education, there may have been a different... it would have just been adjudicated under their policy. At the moment that these stay put protections applied, they have to give a notice, they have to give the opportunity for due process, and also the stay put applies while we're going through there. And again, what the courts have said in the St. Tammany case is that at that point, residency is an allocation issue. We're just determining who's going to be responsible for providing and paying for the services. At this juncture, the students right to the continuous education should not be disrupted. That's the whole purpose of a stay put. While we're litigating or while we are fleshing out the residency issues, the student should have been entitled to stay in his placement at that time. But you did get a stay put order from the ALJ, right? Yes, sir. And there was an evidentiary hearing on the very issue of residency. Is that not true? There were two separate issues. So the ALJ did grant stay put, and then afterwards there was a hearing on residency. But at the moment that the stay put was granted, the stay put applies to all proceedings, including judicial review. And so where we got off track is then when we get over to the district court, they did not enforce the stay put placement. Okay, let me ask you, because you cited, referred to St. Tammany a couple times already, and so that's an uneasy segue for me. In your briefing, you know, you've cited St. Tammany and quoted from it someplace, and we've given you notice ahead of time that we have some concerns that some of the language there is not in those cases, but it was generated by artificial intelligence. And so giving you notice, you know, about that. So particularly given that you've cited St. Tammany for the propositions you just finished, I just have to ask you what's your position on the matters that we've identified? In regards to the uses of AI? Yes, ma'am. I have used AI to help me with researching an organization. However, all the judgments, the analysis are my own. Well, the point being, our rules in the Fifth Circuit don't permit you to file a brief where there's phantom sites or any use of artificial intelligence in the brief, particularly just putting them there without any attribution or whatever. If you practice here, you have to know the rules of engagement. And once we read the briefs and we can find these, then we deem their phantom in this language in the St. Tammany case and the court rules and the specific guidelines from the Crooked Court about that. We have in this court year sanctioned lawyers. One lawyer was sanctioned $1,000 for using AI in a brief. In a word, there are some places, lots of things can happen, but it's just like in here. People can't wear hats in here. People can't do a lot of things that they can do in other places. But this remains the last bastion where we can decide what happens and what doesn't. And so just you may use artificial intelligence in another arena. And the court acknowledges that AI is here. We're not ignoring it, but we haven't reached the point where a lawyer can just do a brief with AI assistance and it's just kind of dropped in there. But for us reading the material, we found it and it's not there. And we've cross-checked it and it's not there. So that's the reason why you were told, be prepared, that we're going to ask you about it. So are you aware of the court's rules about this? Yes, sir, I am. And being aware that you did it anyway? I would say, sir, that again, any use of AI was just to help me with finding cases. But the question doesn't go to your motives, counsel. The question doesn't go to your motives, the sincerity, the representation of your client, none of that. My question and none of it is to impugn your motives. The one does not get to circumvent the rules because one has a pure heart. Do you understand what I'm saying? Yes, sir. And that goes for any lawyer. You know, it's not about contention. No one questions the zealousness and sincerity representation of your client. But anything does not go. Yes, sir. It just doesn't. So we're not looking for a pound of flesh, but it's for you to understand, know the rules and follow the rules. Not just know them and then do something because you've got a good motive. That just doesn't work. Can we understand that this is the last time anyone has to have a conversation with you about using AI in a brief? Yes, you can. All right, that's all I need. All right, you have reserved your rebuttal time fully and you don't need to address this issue more. You stay with the merits of your case. I've asked you all, I want to ask you about AI and the case is not going to turn on the use of the AI. So nothing in the final disposition is going to have anything to do with that. That's just purely a lawyer-judge conversation. You follow me? Yes, sir. All right, so you've reserved your rebuttal time to come back up. So we'll hear from the other side and then you have your time. All right, counsel. May it please the court. My name is Timothy Rivera. I am an attorney for St. James Parish School Board. This case turns on one core fact. Residency is not enrollment. This is a residency case and as Judge Engelhardt mentioned and as mentioned by Judge Stewart as well, residency is an important factor and in fact a threshold factor in determining whether or not a school district owes a right to a free and appropriate public education to a student. Enrollment, on the other hand, is the act of submitting documents and the court is right that those documents, the district rely to a certain extent on those documents and their accuracy. But enrollment is the act of submitting documents to attend a school. But residency is the legal fact in special education law and it has legal consequences when it comes to the district's responsibilities to not only evaluate a student but also to provide, if eligible, the student with special education services. In this case, Ms. Herbert was never a resident of St. James Parish. That's an undisputed fact here and there is no fact in the record that indicates that she lived at any time relevant to this case in St. James Parish. And that undisputed fact was the reason that the ALJ did not allow Ms. Herbert to continue her due process complaint against St. James Parish. And that's the core reason for the rulings that this court saw by Judge Ash at the district court level. Once the determination was made, no one is disputing the eligibility or entitlement of the child, right? That's not at issue. Right? No, in terms of eligibility, we're not disputing the district's conclusion. Yeah, I'm saying that the process occurred in terms of what all happens to make sure the child deserves a FAPE, etc., etc. So that all, none of that was in question, right? So it's just the residence part wasn't identified until the process had gone along further, right? Yes. I mean nobody saw at the beginning that this person doesn't live here. No, and the district, the school district upon enrollment did not realize that Ms. Herbert did not live in St. James Parish. Right, so once the determination, how long was it, had the, how long after initial enrollment was it when the residence concern identified? That was approximately three months. So the school year starts in August and there was some additional information, and this was all fleshed out by the ALJ in her January 2025 year. So the child had been benefiting from the services during those three months? In terms of, not special education services, but in terms of the educational programming and attending Cypress Grove Montessori Academy during that time. Does the statute trigger any kind of a concomitant obligation or allowance, for example, if the child was not a resident of St. James Parish, identifying similar service in his home parish and sort of, you know, fast-tracking him because all the rest of this has been done? You understand what I'm saying? I mean if he lived in the adjacent parish, but all this pre-workup has been done, he's just in the wrong parish. Well what the statute allows, and this is something that does come up from time to time in the area of education law, these parishes are neighbor parishes. So what should have happened here was that the documentation that was generated in St. James is provided to the parent, and the parent enrolls in the parish in which she resides, in St. John. And that documentation, and when students transfer between parishes, all of the educational records in one parish is then submitted over to the other parish. So in this case, and as noted in a letter that was provided in December of 2025 to the parent, saying enroll where you reside, we believe it's St. John, so take the documentation there, and we will work with St. John in order to make sure all the documentation that we've generated is provided in St. John. In addition to that, this December, a letter also stated that St. James would make a professional available to work with St. John to address the continuity of the student's education. So hopefully DH was able to move forward in the special education process in the appropriate parish where they reside. So I hope I answered your question. No, you did, you did. Thank you. Yeah, and that's an important point as well, on the point of continuity, and going back to the December 2025 letter that I mentioned, that has been available to Ms. Herbert the entire time. If you reside in a parish, and based even on the special education statutes that we provided, you are able to go and enroll in a school in that parish, and there's no reason to delay and try to force your way into a parish where it's clear that you do not reside. Council opposite mentioned a procedure whereby a person from another parish could apply for, there's a mechanism for them to apply for and receive an education pursuant to a faith. Would you address that? Is that in any way applicable to this case? You disagree that it applies to this case, or is that something that could have or should have happened in this case? We strongly disagree, and just listening to the appellate's argument before the court, that has not been our case. The facts of our case is that there was an affidavit, as your Honor mentioned, that indicated that the parent did live in St. James, and they relied upon it. So there was no application to St. James as a non-resident, or any permission to proceed with the district having knowledge that the family lived in St. John. So that's not our case, and that is, and if the court reviews the briefing, that is not how this case is briefed. That is a new twist that we are hearing. Is there a policy for non-residents to attend? And if so, what is that policy? Yeah, there is a policy, but St. James would have to agree with everybody understanding the applicable facts that they would take a student from another parish, but that is not the situation here. And just knowing that there's some districts that do cooperate in that way, but that is not the situation here. With regard to the additional idea claim, just to reiterate a couple items while I have additional time, or have remaining time. The threshold issue, that is the gateway to all of the claims that we see here. So with regard to residency, you need to be a resident in order to ask a court to allow you to stay put in a parish when a due process complaint is filed. So that is a threshold issue. As the district court held, that is one problem with the appellate stay put argument, but their problem with regard to stay put is twofold. The first issue is jurisdiction, as Judge Stewart mentioned. The second issue is that this student never had an IEP in St. James Parish. So if the court looks at 20 U.S.C. 1415-J, which is the stay put statute, that statute uses language that says, then current educational placement. And this is what we would be briefed. And when you unpack the word educational placement, there's a common use, but there's also a legal use that this court has ruled on in the case that we cite White v. Ascension, which defines educational placement and makes clear the educational placement is an IEP. It's not a school location. And that was the crux of that case. So in the case law that we provided indicates that to have an educational placement, you have to have an agreement on an educational program for a student with disability. So there was no, in this case, there was never an agreement on the educational program because of the discovery of the residency issue. So there was no then current IEP placement for the Ms. Herbert to claim to go back to. So there was no placement to stay put in based on the unique facts of this case. In addition to basically the timeline in terms of the stay put orders, there was an order by the AOJ to issue stay put, but that was before she had the evidentiary hearing that determined that there was no jurisdiction in this matter. And after that, the case was dismissed because there was no FAPE obligation that attached between DH and St. James. Then the next time we dealt with the stay put issue was in district court where the judge denied injunctive relief and then dismissed. So these are all additional indications that there was no jurisdiction and there is no stay put placement for that issue. Additionally, the other arguments included, they all go back to this being a case that is about residency not enrollment. What's the best case that stands for the proposition that residency is jurisdictional, as Judge Stewart described it earlier, as opposed to a predicate qualifying fact for an applicant? Well, there is. We've provided multiple cases. The case that is, I would say, is the one that we will point the court to for that specific fact is the Lower Marion case. And in that Lower Marion case, that's the case out of Pennsylvania. The facts of that case are, Your Honor, that a parent attempted as a non-resident to enroll in a district. And there was a dispute as to how residency was to be developed in that case. And that Pennsylvania court found in the Lower Marion case that this threshold issue needed to be determined by the hearing officer or the administrative law judge before the party could proceed with discussion anything related to special education. And that was a case where the district court in that case kicked, remanded the case back to the administrative law judge to determine residency as that threshold issue that you talked about, Your Honor. With regard to, and the same, and we would essentially give the same answer with regard to the IEE arguments. We didn't have an initial obligation to evaluate because DE was not a resident. And of course there, Your Honor? Is there, with many statutes, and I'm not sure if this ID, there's sometimes a corollary code of federal regulations that sort of augments, you know, what the statute says and has all kind of auxiliary sites and that kind of thing. And I'm not sure if that's the case here, but I guess my question was whether within code of federal regulation, is there a corollary code of federal regulation given the amount of litigation under the IDA statute where this, you know, residency issue pops up? You may have cited in your brief, but we're not claiming to have, you know, read everything in there. Yes, Your Honor. But it just became of interest because it was a threshold question, you know, here. Yes. Well, with the code of regulation, we did not have that in our briefing. But the way that the court can get to that, and we can provide whatever the court needs. Most of this is going to be in 34 CFR 300, around the 500s. So the way that part of the code works is 34 CFR 300.502, thereabouts. But we've related to that, Your Honor. We've also cited the BESI regulation. So we provided the court bulletin 1706 in our briefing, section 230. Okay. I mean, that's helpful. My instincts in dealing with some of this before, you know, the statute says what it says, but like lots of statutes, you know, it's not self-defining. And usually the CFRs and the work through kind of get into the manual of further explicating the point somewhat to the question Judge Engelhardt of in real time, you know, various situations between the pairs because IDA obviously is a huge statute that affects many, many people. But that's fine. If that was in the briefs, we'll find it. The law clerks out there, the audience are paying rapt attention to your site. So they'll dive. Okay. And I would give them our appellate brief at page 13. And then when, what we usually are just working with special education a long time. The BESI bulletin has the corollary code of federal regulation cycling in it. So if they get to that section 230, which talks about the responsibility for LEA within geographic borders, then the corollary federal site should be within that subsection. All right. Thank you. In addition to that with, and I was mentioning IEE, though that of course that stands for independent educational evaluation. Our argument there in the brief, we largely rely on that. Just noting that there's no FAPE obligation in that area. So therefore if there's no obligation to initially evaluate, then there would not be an evaluation or an obligation to provide an independent evaluation in response to the evaluation. And as I noted before, that we are not disputing the accuracy of St. James' evaluation. But if the next steps would have to be in the resident parish, wherever that is. This same threshold issue, as we noted in our briefing, also applies to the 504 arguments. We've argued, and the lower court has held, that because we are dealing with a non-resident student, of course a student in a neighboring parish, that they are not qualified to utilize the services, the educational services, in St. James Parish. And as the court knows, qualification in a program is a fundamental element in a discrimination claim under both Section 504 and Title 2 of the ADA. Also, we note in our briefing that the appellant has shifted to a retaliation allegation. Of course we disagree with that. Our argument is that this is being raised for the first time at the appellate level. And that the timeline, we note in our briefing, that the timeline between the alleged protected activity and the adverse action is reversed. They are alleging in the appellate briefing, because we didn't see it in the lower court, that the district informed the plaintiff that they were being disenrolled. And then there was a complaint about the IEP meeting. So the disenrollment has been described as the adverse action. But then the complaint comes, which would be the protected activity, is coming after the alleged adverse action. So that would not, even if the court were to entertain it at that stage, it would not be sufficient to meet the elements of retaliation under 504. And your Honor, all these things, and the theme here is the residency threshold issue. We're happy to hear the court has been paying attention to that. Because this is a residency non-enrollment, there are no legal claims that are viable, and that were viable below. And there's no viable legal claims here. All of the residency issue has foreclosed all of these issues that have been included by the plaintiff. And it all follows from the core fact that St. James was never the responsible LEA, because the plaintiff was never a resident for any relevant time in this case. And your Honor, for these reasons, and on the district's well, and based on the district's well-reasoned findings below, and also based on the authority listed in our brief, we would ask this court to affirm the judgment for St. James Parish School Board. All right, thank you Mr. Rivera. Ms. Hogan, you have rebuttal. I just wanted to address the complexity of why a parent wouldn't, why this parent didn't just go to a different parish. This parent had requested an IEE, and because it was not clear which district would assume the responsibility, enrolling elsewhere would just compounded that uncertainty. What the statute says is that if a parent requested an IEE, either the district funds it or they file due process. It would have been impractical for her to take an evaluation from one parish and challenge it in a different parish. The policy that you asked for is on record pill pages 361 through 368, that was the policy for the... They're saying that that's a new argument, that that argument was not made before. He was referring to retaliation. Okay. Next, while... I think he also said they didn't understand this to be a situation where they were accepting a student from a non, like a non-resident student. Again, they have a policy for people who do not live in their parish to attend school in their parish. My client applied through that, through the application process, and the school district reviewed the application despite the parent disclosed that she lived in a different parish. They still accepted it. They enrolled him, determined he was eligible, and at that point, the stay put protections applied. Counsel Opposite talked about the white case, and in that case, the parents were trying to change a school site, and that's very different from what's happening here. Here, the parent was trying to ensure that while the residency discussions were happening, that her son continued to receive the continuity of services at the same school site. Counsel Opposite continues to talk about the fact that the student did not have an IEP. However, the ALJ resolved that issue. She resolved that issue. What the law says, or what has been applied through the case law, is that if the student does not have an IEP, then what we look at is the operative placement. In the stay put order, the ALJ did define what the operative placement was, which was at the school that the student was attended, and that analysis that she did was on ROA 328 through 329. Counsel Opposite referred to the Lower Merriam case, and our case is distinguished from that. In Lower Merriam, they actually addressed the residency issue up front. In that case, the student resided outside of their school district and sought access. The district treated residency as a threshold, and they denied enrollment. Our case differs because this school district crossed the threshold once they evaluated the student and determined that he was eligible for the special education services. Are you, in effect, without saying it, making a waiver argument? No, sir, we're not. No, sir, we're not. What we're saying is that at the point that those stay put, or at the point that the student was determined to be eligible, this school district, the residency turned to an allocation issue just to determine who is required to pay for it or to fund it. What's the case that said it transformed to an allocation issue? That's the St. Tammany v. Louisiana. That was an allocation case based on residency. Determining which agency was responsible for paying for those services. Next, I did want to address the standard of review for, this should be remanded back, because the standard of review for IDEA cases is the modified de novo, and here the district court analyzed this case under the Rule 126B, and so that alone would require a remand. What we would expect to see under the modified de novo review is that they're going to engage with the record. So here this district court did summarize the record, but what we would have expected to see was, did they analyze the fate? Did they look at the IEE? Did they determine if there were some compensatory services that were owed to the student? And that analysis just did not occur at all. And then also for the 504 ADA claims, what that looks at, the standard of review for that, is going to look at whether the complaint is plausible, whether it alleges that this is a qualified individual with a disability who was excluded, and we're just looking at all well-pled facts. What can be accepted at the time and viewed in light of the, viewed in the light most favorable to my client, and that's not the analysis that the district court used. Ms. Hogan, you have a red light if you want to make a, concluding one sentence, I'll let you do it. Yes, sir. We again would just conclude in saying that in this case, at the time, once the IDEA obligations were triggered, the school district was obligated to comply with the statute, which means that they had to provide notice, they had to get the opportunity for due process, and the stay put applied throughout the duration of proceedings. He is currently in a private school. The parent had to, because of this issue, we weren't able to get it resolved, but keeping the continuity of the services, and so the parent had to secure education elsewhere, and again just the, it was just kind of muddy up the situation. He's in a private school and thriving. That's all, it was just a curiosity, that's all. We got your argument. All right, we do appreciate the briefing and argument on both sides. The case will be submitted along with the others. The court will stand recess until one o'clock tomorrow.